CLIFFORD J. STODDARD and Others, on Behalf of Themselves and All Other Members of the American Society of Mechanical Engineers, Respondents, *v.* CHARLES M. SCHWAB and Others, Appellants, Impleaded with WILLIAM L. ABBOTT and Others, Defendants.

First Department, December 23, 1938.

*John M. Harlan* of counsel [*Leslie H. Arps* with him on the brief; *Root, Clark, Buckner & Ballantine,* attorneys], for the appellants.

*Nathan J. Stein* of counsel [*Paul L. Ross* and *Morris Vogel* with him on the brief; *Nathan J. Stein,* attorney], for the respondents.

DORE, J. Defendants appeal from an interlocutory judgment directing an accounting and granting other relief after a trial at Special Term in a representative action brought by plaintiffs as

members of the American Society of Mechanical Engineers (here-inafter referred to as the " Society ").

The amended complaint alleges ten causes of action but all relate to alleged liability of defendants in connection with the publication of engineering services known as the Engineering Index Card Service and the Engineering Index Annual Volume. The first seven causes of action seek to recover $215,730.36, claimed to have been lost through defendants' negligence between October 8, 1927, and January 1, 1934, in the publication of this enlarged index service on the ground that such publication was *ultra vires* and a waste and misappropriation of the Society's funds. The eighth cause of action alleges that the Society organized a cor-poration known as the Engineering Index, Inc., to take over the publications, and transferred properties to it without consideration and suffered loss. The ninth and tenth causes of action allege that the Society, through Engineering Index, Inc., employed the firm of Will, Folsom & Smith, Inc., to solicit contributions and paid them unreasonable fees, which plaintiffs seek to recover for the Society.

The answer is a general denial and separate and partial defenses, viz., *res judicata* based upon a visitation proceeding pursuant to the Membership Corporations Law, ratification, the six-year Statute of Limitations as to certain causes of action, and laches.

In the visitation proceeding, commenced in September, 1934, by one or more of these same plaintiffs, a referee was appointed, numerous hearings were held, and voluminous testimony taken. The referee reported, and the court, by order of July 16, 1936, approved the report exonerating the defendants entirely and holding there was no ground for judicial condemnation. That elaborate inquisition and report related to substantially the same matters complained of in this complaint. Although no appeal was taken from that order, this court had held that the order in the visitation proceedings was not *res judicata* (*Stoddard* v. *Schwab*, 253 App. Div. 720 [Dec. 23, 1937]). The issues were thereafter tried at Special Term, and, after taking voluminous testimony and receiving numerous exhibits (the record contains 2,063 pages), the court found that the publication of the index was within the objects and purposes for which the Society was inaugurated, that it was not *ultra vires*, that the defendants acted honestly and without profiting personally in any respect, but also held that the inauguration of the enlarged index and its continuance constituted crass negligence on defendants' part, and the expenditures and losses of upwards of $200,000 were the result of improvidence, unreasonable extrava-gance, waste and carelessness, for which the defendants should

account. The court also held that the organization of Engineering Index, Inc., was *ultra vires;* that the lease dated September 28, 1934, between that corporation and the Society was *ultra vires* and void and should be canceled *ab initio;* that certain payments to Will, Folsom & Smith, Inc., were exorbitant and unwarranted, and the Society was entitled to recover them. A referee was appointed to determine the extent to which the negligence of the defendants damaged the Society and what amount each defendant should pay to the Society; to take and state the account of Engineering Index, Inc., and the individual defendants, and to conduct " a letter-ballot referendum by mail " to determine whether the Society's members desired to continue the engineering index in any form.

Appellants contend that there was no justification for holding defendants negligent in inaugurating and continuing the index services; that there was no basis for canceling the lease between the Society and Engineering Index, Inc.; and that the Society was in no way affected by the questioned payments to Will, Folsom & Smith, Inc., since they were not made with the Society's funds and there is no evidence to show that such payments were excessive.

The defendant Society is a New York membership corporation organized in 1880 under an act for the incorporation of benevolent, charitable, scientific and missionary societies (Laws of 1848, chap. 319). The objects of the Society are stated in its certificate of incorporation as follows: " The particular business and objects of such Society are, to promote the Arts and Sciences connected with engineering and mechanical construction for scientific purposes, and to that end to meet and associate together to read and discuss professional papers, and to circulate by means of publications among its members, the information thus obtained, and for the purpose of maintaining a library."

Article C-2 of the Society's constitution, in effect from 1927 to and including 1934, provides that the objects of the Society are " to promote the art and science of mechanical engineering and the allied arts and sciences," to encourage research, engineering education, the standards of engineering, etc. Under its constitution the affairs of the Society are managed by a board of directors known as " the Council," to which is given " full control of the activities of the Society, subject to the limitations of the constitution," and all " papers and publications of the Society shall be issued in such manner as the Council may direct." The deposit, investment and disbursement of funds are " subject to the direction of the Council." By-laws, in effect throughout the period in question, provide that all publications of the Society shall be in charge of a standing

committee under the direction of the council, and all income from and expenditures for publications and " all policies in regard to publications shall be controlled by the Council."

The Society has seventy-one organizations (called local sections) in engineering centers of the United States, and sixteen technical subdivisions. Between 1928 and 1933 its membership ranged from between 18,780 to over 20,000, but at the time of the trial there were approximately 14,500 members.

The Society's headquarters are at the United Engineering Building at 29 West Thirty-ninth street, New York city, the erection of which was made possible by a contribution of over $1,000,000 from Andrew Carnegie, which was obtained from Mr. Carnegie primarily through the efforts and good will of the defendant Charles M. Schwab.

In carrying out its purposes the Society has engaged in a great and increasing variety of activities, such as the publication of standards for the manufacture of mechanical appliances, the publication of boiler, safety and power test codes, the maintenance of an engineering library, and the issuance of various publications dealing with engineering subjects, including the publication of engineering index services.

The inauguration in 1927 of the enlarged index, which is here objected to, was the outcome of a long period of indexing activities of the Society commenced many years before. As early as 1909 the Society considered the publication of indexes and digests of current articles in engineering publications. In 1912 the Society's *Journal* included a section consisting of indexes and digests of selected articles appearing in current foreign publications. This was expanded from time to time, down to and including 1918, when the Society, pursuant to a resolution of the council, purchased from Engineering Magazine Company the right to publish and sell a publication called *The Engineering Index* which theretofore had been printed by the Engineering Magazine Company. That index consisted of indexing and digesting on a selective basis various current articles in engineering publications. The acquisition of the engineering index was reported at the time of its purchase to the members of the Society. Commencing January 1, 1919, a section known as " The Engineering Index " was published in the Society's publication *Mechanical Engineering*. From 1918 down to 1933 the Society published each year an annual volume of the engineering index, which consisted of selected indexes and digests of current articles appearing in magazines and engineering periodicals printed throughout the world. This engineering index was incomplete before the enlarged service was inaugurated and as

engineering literature increased there arose a demand for a complete index.

In 1925 discussions were held by the officers and committees of the Society with a view to expanding the engineering index and making it complete. Reports and suggested plans were considered in 1926, and a complete investigation, survey and report made and submitted early in 1927 by Professor deZafra, a consulting engineer and professor of engineering at New York University. In August, 1927, the proposed expansion of the engineering index was further considered and interviews had with more than twenty-nine representatives of various institutions on the feasibility of a complete index. Of this number twenty-five were in favor of the expanded service; only four questioned its desirability or probable success. As reported by Professor deZafra in August, 1927, the outstanding consensus of opinion was in favor of the proposed index. Copies of these reports were submitted to the council and they were supplemented by an oral report by Professor deZafra before the council acted. After a full discussion, upon the recommendation of the publications committee, concurred in by the finance committee, the council, in October, 1927, authorized the publication of the enlarged index and appropriated $35,000 for that purpose.

The publication commenced on January 1, 1928. That the inauguration of this service was never formally submitted to a formal meeting of the Society is immaterial, as under the Society's constitution the management of its affairs and full control of its activities are vested in the council. In any event, the members of the Society were advised of the plans for enlarging and continuing the services. A report was made at a meeting of the whole Society in December, 1927, in which the establishment of this new index was described to the members, and the finance committee made a statement regarding the financing required for the enlarged index. This expansion of the indexing services was also announced to the members in the annual reports of the Society's committees, copies of which were sent to each member. The project was also announced in the December issue of *Mechanical Engineering*. Thereafter members were kept currently informed, through the various publications of the Society, as to the operation of the index services. We find no basis whatever for any claim that the Society did not know what was being done.

The index services by no means constituted the major activity of the Society. The Society's total income and expenditures in connection with all its operations during the period in question are large. Thus, for example, for the years 1929 to 1931 its income

and expenses were, respectively, as follows: 1929, $777,575.57 — $741,920.34; 1930, $814,080.40 — $775,011.07; 1931, $825,914.12 — $840,681.67. During the six-year period involved the total cost of the index was about $200,000, less than five per cent of the Society's total expenditures, which in that period amounted to about $4,000,000 in all its various activities.

The enlarged index was published by the Society from January 1, 1928, to January 1, 1934, and consisted of a current index and digest of the current engineering literature of the world and an annual volume collating at the end of each year all indexes and digests made throughout the year. The card service enabled engineers to keep abreast of current developments. After January 1, 1928, the engineering index annual volume was elaborated to include indexes of substantially all current articles appearing in engineering literature printed throughout the world.

During 1932 the Society, feeling the effects of the long-continued depression, reduced its expenditures by vigorous measures of economy, also affecting the operation of the index; substantial reductions in salaries were made, and in June, 1933, the executive committee of the council determined that, in view of the shrinkage of the Society's general revenues, the index should not be continued beyond the year 1933 unless special funds were obtained from outside sources. This action was approved by the council.

In January, 1934, the members of the staff of the index offered to assume the responsibility of operating it at no expense to the Society. Authorization was given to carry on the index with the understanding that the Society would be cleared of all responsibility after January 1, 1934. A special committee was appointed, and, following a recommendation of that committee, the services were published by the staff from January 1, 1934, to October 1, 1934, without financial risk to the Society. On October 1, 1934, publication of the index was turned over to Engineering Index, Inc., incorporated by certain members of the Society under the Membership Corporations Law of the State of New York.

On September 28, 1934, a written agreement was made between the Society and Engineering Index, Inc., under the terms of which the latter, since October 1, 1934, has published the index services and the annual volume at no cost or expense to the Society.

It is unnecessary to give further detail in connection with the council's activities concerning the index or to discuss all of plaintiffs' numerous claims. The record is replete with evidence showing the continual care and intelligent attention given to this aspect of the Society's activities.

A review of this record, the exhibits and the briefs convinces us that the judgment appealed from is based upon a misconception of the facts and should not be permitted to stand. The inauguration and the continuance of the enlarged index service during the period in question were manifestly within the Society's charter purpose and not *ultra vires*, and by reason of such activities we find no actionable negligence established or other breach of legal duty causing or contributing to cause to the Society damages for which these defendants or any of them should be held liable.

The obvious purpose in publishing this enlarged and perfected index was the advancement of the science of engineering in which the Society was primarily interested. The council acted only after careful investigation and after full consideration of recommendations made by the various standing and special committees of the Society. No evidence was adduced and there is nothing in the record to show that the publication of the Society's index service between 1927 and 1934 was not in all respects efficiently conducted, nor is there the slightest proof of waste or extravagance in salaries, rent, the hiring of employees, etc., in connection with such publication. Defendants acted in good faith, without dishonesty. None profited personally in any respect.

The price of the index service, which was only one of a number of useful engineering publications distributed and sold by the Society, was calculated to make such index service a self-supporting activity of the Society and to produce a return which would equal the costs of publication and not a profit for the distribution to Society members. Such activities within the chartered purposes of the corporation were not *ultra vires*. The Society was not organized or the index conducted for profit but to promote the engineering sciences.

Practically all the essential features of the index services, as published subsequent to 1928, are found in the prior services, which are not attacked. The difference is that, whereas the former was an abridged, the latter was a complete, service. Both services were sold to non-members as well as to members of the Society, the policy being to serve the engineering profession generally in direct fulfillment of the purposes for which the Society was formed, viz., " to promote the arts and sciences connected with engineering and mechanical construction for scientific purposes," as stated in the charter. Because the charter thereafter says " and to that end " to hold meetings and circulate publications " among its members," etc., plaintiffs contend that the expressed means are the only means the Society may employ. Such construction is wholly unreasonable. While these means are mentioned they are

clearly not exclusive, and this is the rational, sensible and practical construction of the charter that was followed over a long period of years.

This record establishes beyond question that the Society, through its council, gave diligent, intelligent attention, supervision and care to the inauguration and publication of the index service. Plaintiffs are enabled to argue otherwise only by selecting from various reports and the testimony of witnesses, a few isolated quotations, while ignoring the record as a whole. Thus plaintiffs make a partial quotation from four out of twenty-nine interviews in connection with the deZafra report, only four of which expressed doubt as to the wisdom and practicality of enlarging the index service. Plaintiffs refer to these few unfavorable opinions, develop their comments in full, and then argue that, despite the strong adverse opinions expressed, the council, on October 8, 1927, voted to authorize the publication committee to proceed with the engineering index weekly card service. An examination of that report, however, shows that the plaintiffs' argument, and the comment of the court thereon, was possible only by totally ignoring the overwhelming majority of the opinions in the report, which show complete and even enthusiastic approval of twenty-five out of twenty-nine leaders whose views were sought.

Plaintiffs ignore the fact that, as a result of its final report, Will, Folsom & Smith, Inc., recommended that a money-raising campaign be undertaken to continue the index. Plaintiffs quote from thirteen interviews attached to that report, whereas thirty-nine representative persons were interviewed. Only three or four expressed the view that the services were not worth continuing. Of the remaining thirty-six, twenty-five unequivocally approved and the balance agreed that the service should be continued if possible.

Plaintiffs also quote from examinations before trial of certain of the individual defendants, but many of the questions asked were regarding details that happened long prior to the examination and as to which the witnesses were without records, and some of them concerned matters occurring wholly or in part during periods when the witnesses had ceased to be members of the council. In any event, before liability could be predicated against any of the defendants the burden of proof was on the plaintiffs to show a negligent waste of the Society's funds, and this was not established. Plaintiffs called not a single witness to contradict the testimony of the three experts called by defendants to establish the value of the index services.

Engineering Index, Inc., is a membership corporation, separate and independent from the Society. The Society never made any

financial contribution to it, and the Society has no ownership or supervision over it.

By contract, dated September 28, 1934 (effective October 1, 1934), the Society leased to Engineering Index, Inc., for a period ending December 31, 1938, its index equipment and also the right of publication of the index services in consideration of a fixed percentage of the gross receipts from publication. The expediency of the lease and the adequacy of the consideration rested solely with the members of the Society's council acting in good faith. By this contract the Society did not convey away its property; it merely leased a right to publish and also rented the use of the index equipment of the Society. The contract was eminently fair and proper, since it accomplished a continuance of the publication of this useful index service without further expense to the Society, thus providing advantages to the Society and the engineering profession as a whole. Clearly a membership corporation can rightfully lease its own property and especially so where the transaction will serve to promote, without expense, one of the objects for which it was organized.

The Society was in no way affected by the payments to Will, Folsom & Smith, Inc., since none of the funds of the Society were used in making such payments. With the aid of contributions of $1,600 solicited from individuals, and not with any funds of the Society, Will, Folsom & Smith, Inc., was engaged by a special committee to make the 1934 survey and report on the index. The contributions were not made to the general funds of the Society.

The moneys used to pay Will, Folsom & Smith, Inc., for the later money-raising campaign conducted on behalf of Engineering Index, Inc., belonged to Engineering Index, Inc., and not to the Society. The arrangements under which Will, Folsom & Smith, Inc., were engaged were made by Engineering Index, Inc., and the Society never contributed toward the cost of the campaign. The plaintiffs in this action are all members of the Society. None of the plaintiffs is a member of Engineering Index, Inc. Obviously, the only claims which the plaintiffs can assert in this representative action are claims which belong to the Society. The complaint against Will, Folsom & Smith, Inc., as a defendant had been dismissed on April 13, 1938, before the trial. We find no basis for the judgment directing an account for sums paid to Will, Folsom & Smith, Inc.

In view of our determination on the merits of the issues raised herein it is unnecessary for us to pass upon the defenses of the Statute of Limitations, ratification and laches.

The interlocutory judgment appealed from should, in all respects, be reversed, with costs, and the amended complaint dismissed upon the merits, with costs.

MARTIN, P. J., GLENNON, COHN and CALLAHAN, JJ., concur.

Interlocutory judgment unanimously reversed, with costs, and the amended complaint dismissed upon the merits, with costs. Settle order on notice reversing findings inconsistent with this determination and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.